## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

TIMOTHY SCHERMAN,

Plaintiff,       Case No. 19-cv-01866

v.

           Jury trial demanded

INDIANA UNIVERSITY and
GWEN GIALLONARDO,

    Defendants.


## **COMPLAINT**

Plaintiff, TIMOTHY SCHERMAN ("Plaintiff"), by and through his attorneys, alleges the following against Defendants INDIANA UNIVERSITY ("IU") and GWEN GIALLONARDO:

## **OVERVIEW**

1.  On November 13, 2018, Plaintiff, a 21-year old junior at IU, was sentenced to a two-year suspension for allegedly having sex with Defendant Giallonardo, a young woman with whom he had a prior sexual relationship, while she was intoxicated.  IU's decision to suspend Plaintiff was based on the conclusion of the Hearing Panel ("the Panel") that he "knew or reasonably should have known she was incapacitated" during a sexual encounter after a Halloween party on October 28, 2017 ("the Decision").

2.  The Panel's determination that Defendant Giallonardo was "incapacitated" was based, in part, on a finding that she had experienced an "alcohol induced blackout" or "loss of consciousness" on the night in question. This finding was based solely on Defendant Giallonardo's fabricated testimony, which was not supported by a single witness, and contradicted by most.

1

Defendant Giallonardo offered no evidence of any "loss of consciousness," nor did any of the more than a dozen witnesses who attended the party, including numerous "sober monitors," observe any behavior indicating that she was overly intoxicated.

3.      The evidence before the Panel also did not establish by a preponderance of the evidence that Plaintiff was "the individual initiating sexual activity" and that he "knew or should have known of [her alleged] incapacitation," both of which are required to prove a violation of the University's Sexual Misconduct Policy.  To the contrary, the evidence before the Panel was undisputed that, after pursuing Plaintiff at the party, Defendant Giallonardo actively participated in the sex act, including positioning herself on top of him and calling out repeatedly for him to "fuck" her – behavior that Defendant Giallonardo admitted was consistent with their acknowledged "history of 'drunkenly hooking up.'" Such behavior directly refutes that Plaintiff was "the individual initiating sexual activity," and certainly could not have put him on notice that she was an unwilling or unable participant.

4.      Defendant Giallonardo did not deny Plaintiff's recollection of their sexual encounter.  Indeed, she admitted at the hearing that it was "possible." She also admitted, and others confirmed, that she was less intoxicated on the night in question than on previous occasions. The Panel's failure to consider this critical evidence anywhere in its Decision affected the outcome of the case.

5.      Defendant Giallonardo's entire accusation rested on her claim that she simply could not remember what happened.  Her failure to remember the evening's events, however, failed to prove, by a preponderance of the evidence, as it was required to, that Plaintiff "knew or should have known of [her alleged] incapacitation," as required to prove a violation of the University's Sexual Misconduct Policy.

6.     IU disregarded this and all other exculpatory evidence supporting Plaintiff's vehement denials of wrongful conduct and accepted Defendant Giallonardo's unsupported accusations for no reason other than the fact that Plaintiff is male and Defendant Giallonardo is female.

7.     For the Panel to have imposed such a harsh sanction against Plaintiff based on little more than Defendant Giallonardo's lack of memory and mere speculation about what "might" have happened, is grossly disproportionate and a miscarriage of justice, in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.* ("Title IX"), the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution, and IU's contractual obligations to Plaintiff.

8.     Defendant Giallonardo's allegations against Plaintiff, including that he gave her a "roofie" (a date rape drug), which was acknowledged by the Panel to be untrue, that Plaintiff had inflicted "bruises" on her during their sexual encounter, which she later recanted, and that she had been sexual assaulted while unconscious, which was contradicted by the evidence, were outrageous, false and defamatory. Defendant Giallonardo's motivation for contriving such a story may have been that she felt embarrassed that Plaintiff's interest in her was only sexual, as evident from her admission at the hearing that she was "ashamed" about what had happened and upset that Plaintiff appeared to "laugh off" their encounter the night before.

9.     As a result of IU's unlawful conduct and Defendant Giallonardo's false and defamatory allegations, Plaintiff's life has been shattered. Not only has his education been disrupted for the next two years at IU, but he is unable to transfer to another college to complete his education because the suspension has been recorded on his academic transcript. Even if he were to try to return to IU after the suspension period, the Panel's Decision makes clear that

reinstatement is not guaranteed.  The net effect is to deny him the right to obtain a college degree, which has enormous consequences for his future employability and economic opportunities.

10.     In addition to the educational and economic impact of Defendants' unlawful actions,  Plaintiff has suffered grievous emotional damage.  His reputation has been destroyed, he has lost his entire college network of friends, and he is rightfully hopeless about his future.  As a result of the stress and humiliation inflicted on him, Plaintiff continues to require intensive treatment for extreme depression, anxiety, emotional distress and suicidal ideation.

## PARTIES

11.     Plaintiff, a 21-year old male, is a citizen of the State of Illinois. In the fall of 2018, Plaintiff was a junior at IU majoring in Computer Science and a student in good standing. Plaintiff transferred to IU from Rollins College in January 2017.

12.     Defendant IU, the flagship institution of the Indiana University system and its largest university, is an Indiana not-for-profit corporation with its principal place of business in Bloomington, Indiana.

13.     Defendant Giallonardo, female, is a citizen of the State of Pennsylvania. On information and belief, she graduated from IU in May 2019.

## JURISDICTION AND VENUE

14.     This action arises under Title IX, the Fifth and Fourteenth Amendments to the United States Constitution, and Indiana common law.

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

17.     Venue is proper pursuant to 28 U.S.C. §1391 because the events giving rise to this claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Sexual Encounters Between Plaintiff and Defendant Giallonardo

18.     Plaintiff and Defendant Giallonardo first met in Spring 2017 at a party hosted by Plaintiff's fraternity, Phi Lambda Pi.  They began a consensual, casual sexual relationship in Summer 2017 when they were both living in Chicago.  However, once they returned to the IU campus in Fall 2017, they fell out of touch as Plaintiff was not interested in pursuing a more serious relationship.

19.     Defendant Giallonardo was frequently under the influence of drugs or alcohol during their sexual encounters, which Defendant Giallonardo has described as their "history of drunkenly hooking up."

20.     On October 28, 2017, Defendant Giallonardo attended a Halloween-themed mixer between Plaintiff's fraternity and Defendant Giallonardo's sorority, Delta Phi Epsilon, at the Phi Lambda Pi house.  Approximately one hour before going to the party, she drank one shot of vodka and smoked a small amount of marijuana, which she claimed was a typical amount for her to consume.

21.     Defendant Giallonardo arrived at the fraternity party at approximately 11p.m. and freely socialized with Plaintiff throughout the party, including talking and dancing with him.  At some point during the party, Plaintiff and Defendant Giallonardo stepped outside the fraternity house so they could talk where it was quieter.  Once outside, they began hugging and kissing as Defendant Giallonardo rubbed Plaintiff's groin and penis over his clothes.  After a few minutes,

they agreed to go back to Plaintiff's apartment which Defendant Giallonardo suggested because she knew he did not have a roommate.

22.     When Plaintiff and Defendant Giallonardo arrived at his apartment, they went into Plaintiff's bedroom, took off their clothes, and began to have sexual intercourse.  At various points, Defendant Giallonardo straddled Plaintiff who lay beneath her, as she screamed "Fuck me!"  She also attempted to mount him to resume the sex act as he started to fall asleep. Plaintiff did not ejaculate during any of their sexual activity that evening.

23.     At no point during this evening did Defendant Giallonardo give Plaintiff any indication that she did not consent or was unable to consent to their sexual activity.  To the contrary, Defendant Giallonardo's behavior during this sexual encounter was completely consistent with Plaintiff's previous sexual consensual experiences with her.

24.     After waking up in Plaintiff's bed the following morning, Defendant Giallonardo again climbed on top of Plaintiff and tried to have sex with him.  Again, Plaintiff did not ejaculate.

25.     Plaintiff then made breakfast for Defendant Giallonardo in his apartment and drove her home where, at her request, he waited for her to change her clothes and then drove her to work. Sometime that morning, they made plans to get together later that day, but those plans were later cancelled.

26.     Plaintiff and Defendant Giallonardo had no further contact after the morning of October 29, 2017.

**Defendant Giallonardo Files A False Complaint Against Plaintiff**

27.     On August 8, 2018, Defendant Giallonardo submitted a complaint to the Office of Student Conduct ("OSC") alleging for the first time that Plaintiff had sexually assaulted her ten (10) months earlier after the Halloween party.

28.     Between August 8-September 18, 2018, the OSC's Investigator interviewed fifteen (15) witnesses regarding Defendant Giallonardo's allegations, including Defendant Giallonardo, Plaintiff, nine (9) of Defendant Giallonardo's sorority sisters, and others present at the party which led to the alleged incident.

29.     Defendant Giallonardo admitted during the investigation that she had no memory of the incident at all, but since she had been intoxicated during the party, she assumed that Plaintiff had forced her to submit to sexual activity without her consent.

30.     Defendant Giallonardo further accused Plaintiff of "spiking" her drink with a "roofie"-type drug which, she claimed, might account for her inability to recall the incident.

31.     Prior to this complaint, Plaintiff had never had any prior claims of misconduct against him.

32.     The Investigator issued a Final Report ("the Report") on October 19, 2018 which concluded that the following material facts were in dispute:  (1) whether Plaintiff subjected Defendant Giallonardo to sexual contact without her consent, (2) whether he "penetrated [her] vagina with his penis by force," (3) whether Defendant Giallonardo was "incapacitated" during sexual activity, and (4) whether Plaintiff "knew or should have known that Defendant Giallonardo was incapacitated."

**<u>The Hearing</u>**

33.     On November 1, 2018, a hearing was held before IU's Sexual Misconduct Hearing Panel, which consisted of two IU administrators and one instructor. Defendant Giallonardo and Plaintiff appeared in person; ten other witnesses testified by telephone.  The statements of the remaining witnesses who were unable to be reached by telephone were contained in the Report which was part of the record.

34.     While Plaintiff was permitted to have a "representative" present during the hearing by Skype, this representative was not permitted to speak or participate in any way during the hearing.  As a result, Plaintiff, an unsophisticated 21-year old with no legal training, was effectively forced to represent himself throughout the hearing.

35.     Neither Plaintiff nor his representative was permitted to cross-examine Defendant Giallonardo or any other witnesses during the hearing.

36.     Prior to the hearing and in accordance with IU's "Procedures for a Sexual Misconduct Hearing" which permit each party to "submit questions to the Chair to be asked of the other party," Plaintiff submitted 29 questions for the panel to ask Defendant Giallonardo. Plaintiff's proposed questions were intended to probe Defendant Giallonardo's sexual history with Plaintiff, her conduct both on the night of and morning after the incident that indicated her consent, and her capacity to consent. However, the panel failed to ask most of Plaintiff's proposed questions, and modified the questions that they did ask.

**IU's Erroneous Decisions Against Plaintiff**

37.     On November 13, 2018, the Panel issued its decision finding that "the preponderance was not met that Plaintiff used force during sexual contact or sexual penetration." However, it concluded that Plaintiff had violated the University's Sexual Misconduct Policy because he "knew or reasonably should have known Defendant Giallonardo was incapacitated" during sexual activity.

38.     Based on this erroneous conclusion, the Panel ordered that Plaintiff be suspended from the University for two (2) years, prohibiting him from participating in all aspects of University life, and barring him from the University grounds.  The suspension was recorded on Plaintiff's academic transcript throughout the term of the suspension, which effectively prevents

him from transferring to another college to complete his education.  Reinstatement after two years is not guaranteed.  Plaintiff was forced to immediately leave campus right before final exams.

40.     IU's Sexual Misconduct Policy requires that a finding of a policy violation must be supported by "a preponderance of the evidence."  This standard is defined in the Policy to mean that "it is more likely than not that the Plaintiff has committed one or more acts of sexual misconduct."

41.     IU's decision to suspend Plaintiff for sexual assault was not based on a preponderance of the evidence.  To the contrary, it was completely unsubstantiated, and mostly contradicted by the record evidence which cast articulable doubt on the accuracy of the hearing's outcome. IU reached this erroneous outcome by:

      a.    <u>accepting Defendant Giallonardo's unilateral version of events, despite her admission that she had no memory of the incident,</u> and a lack of any evidence to corroborate her story, despite the testimony of over a dozen witnesses, including multiple sorority sisters and "close friends;"

      b.    <u>concluding that Defendant Giallonardo was "incapacitated due to alcohol and marijuana use,</u>" despite overwhelming evidence to the contrary, including *Defendant Giallonardo's own statements* during the investigation and hearing that:

- she was definitely "not stoned to the point of disorientation;"

- the effects of the pre-game pot use had "worn off" by the party and she did not smoke any more pot after the pre-game;

- she had a "pretty high tolerance" for marijuana;

- she could not recall whether she had taken Adderall that day, and that, even if she had, she took a very low "extended release" dose in the morning which did not have any increased effect with alcohol or marijuana;

- she had only one vodka shot at the pre-game party several hours before the sexual encounter and only one cup of wine (a Solo cup "filled a little over half") at the Halloween party, which was *less* than the 2-3 glasses of wine she typically drank at parties.

c.  <u>ignoring the statements of witnesses who corroborated that Defendant Giallonardo was only minimally intoxicated</u> on the night of the alleged incident -- not "incapacitated" as the Panel found -- including statements that:

- Defendant Giallonardo explicitly told a friend who attended the party with her that she had not drunk "a lot of alcohol" that night;

- according to another eyewitness at the party who had "a lot" of experience drinking with Defendant Giallonardo, she appeared less intoxicated on the night in question than on previous occasions;

- Defendant Giallonardo told her boyfriend at the time of the complaint that she only "had one or two drinks" on the night of the incident and "didn't feel like she was super drunk."

d.  <u>concluding that Defendant Giallonardo "lost consciousness" on the night in question</u>, despite any supporting evidence whatsoever, and all evidence to the contrary, including:

- Defendant Giallonardo's own admission that she not experience any of the symptoms that night that she typically experiences with near or actual "blacking out," such as slurring her words, inability to stand straight, poor hand-eye coordination, or poor vision;

- the testimony of more than a dozen "sober monitors," fellow students from the hosting sorority and fraternity whose primary job was to look out for signs of intoxication at the party, that Defendant Giallonardo did not show any signs of "visible impairment" at the party;

- Defendant Giallonardo's active participation in the sexual act – sitting upright on top of Plaintiff and loudly vocalizing -- which Defendant Giallonardo admitted in the hearing was "possible" and which *would have been physically impossible* if she had actually "lost consciousness."

e.   <u>making the unfounded leap that Defendant Giallonardo's failure to recall the incident was evidence that she must have experienced a "loss of consciousness,"</u> despite Defendant Giallonardo's history of failed memory after drinking without being unconscious, including:

- her admission that "there have been times where she has been drinking and loses some memory of the night;"

- the statements of her friends that Defendant Giallonardo had told them "it wasn't unusual for her to not be able to recall what happens when she is drinking."

11

f.   <u>failing to consider significant lies told by Defendant Giallonardo during the proceedings, which the Panel acknowledged to be untrue, in assessing her credibility,</u> including:

- her false statement that Plaintiff had "placed drugs in [her] drink or otherwise made [her] unknowingly consume drugs;"

- her statements during the investigation that bruises on her arms and legs were inflicted by Plaintiff during the sexual encounter, only recanting this claim later at the hearing.

g.   <u>concluding that Plaintiff "knew or reasonably should have known [Defendant Giallonardo] was incapacitated" during their sexual encounter,</u> despite any supporting evidence, and all evidence to the contrary, including Plaintiff's testimony that:

- Defendant Giallonardo's behavior on the night in question was no different than on numerous prior occasions when they had had drunken, but consensual, sex;

- Defendant Giallonardo actively, and with full consciousness, participated in the sex act, as evidenced by her positioning herself on top of him and her vocalization for him to "fuck" her;

- Defendant Giallonardo definitely did not seem to be "one drink away from blacking out" at any point in the evening, as the Panel appears to have concluded;

- the morning after the alleged incident, Defendant Giallonardo initiated sex by climbing on top of him again;

- Defendant Giallonardo voluntarily had breakfast with him in his apartment and then asked him to wait while she changed clothes at her apartment after he drove her home, so that he could then drive her to work;

- Defendant Giallonardo made plans to see him later that day, less than 12 hours after the alleged "assault."

h. <u>failing to consider relevant aspects of the parties' undisputed "history of drunkenly hooking up</u>" for several months before the alleged incident, including:

- undisputed evidence that all of their previous sexual encounters had been consensual, even when Defendant Giallonardo was drunk,

- undisputed evidence that, whenever Defendant Giallonardo had indicated in prior encounters that she did not want to have sex, Plaintiff had always respected her wishes;

- undisputed evidence that Plaintiff had refrained from having sex with Defendant Giallonardo in the past, even when she had asked him to "fuck the shit out of [her]," when he thought she seemed too drunk.

i. <u>completely disregarding evidence of Defendant Giallonardo's obvious expressions of interest in Plaintiff on the night in question,</u> according to the unrefuted observations of numerous eyewitnesses, including Defendant Giallonardo's best friend who was with her throughout the party, that:

- "it seemed like [Defendant Giallonardo] wanted to be with [Plaintiff]";

- she "had her arm wrapped around [his] waist";

- she seemed "very willing to talk to" him;

- they kept "finding their way to each other throughout the party" at least 5-6 times;

- she asked him to "stay here and talk to [her]" when he tried to walk away;

- she forcibly resisted her friend's efforts to stop her from "intimately dancing" with him;

- she was "all over him" when they stepped outside the party, including rubbing his groin and penis.

j.   assuming that Plaintiff was "the individual initiating sexual activity," as required for a violation of the Sexual Misconduct Policy;

k.   assuming that Plaintiff himself had sufficient capacity to assess Defendant Giallonardo's mental state, given his own level of intoxication during their sexual encounter;

l.   misconstruing the record evidence and placing undue reliance on whether Plaintiff provided Defendant Giallonardo with an alcoholic beverage at the party, a point made no fewer than five (5) times in the Decision as one of the explicit bases for the decision, despite contrary evidence, including:

- Defendant Giallonardo's hearing testimony that "she only remembers that she got herself one drink from the bar;"

- Defendant Giallonardo's hearing testimony, in response to repeated questions on this topic, that she had "zero recollection" of Plaintiff getting her a drink;

- the fact that, even if Plaintiff had gotten Defendant Giallonardo one drink – which, by all accounts, would have been nothing more than half a cup of wine – this additional alcohol would hardly have been enough to render her "incapacitated" or make Plaintiff believe that she was.

42.    Plaintiff timely appealed the Panel's Decision to the Director of the Office of Student Conduct, but his appeal was denied on December 14, 2018, thereby exhausting all of his options for administrative review.

**Pressure on IU to Respond More Vigorously to Sexual Misconduct Complaints By Females**

43.    As a federally-funded university, IU is forced to follow the guidelines and rules promulgated by the United States Department of Education ("Department") or risk losing millions of dollars in federal funds.

44.    On April 11, 2011, the Department sent a "Dear Colleague" letter to universities receiving federal funds mandating steps universities needed to take in order to comply with Title IX (the "2011 Letter"). Universities that failed to follow the mandates of the 2011 Letter risked losing millions of dollars in federal funding.

45.    According to the 2011 Letter, the mandates were designed to remedy the problem of women being the victims of sexual assault or attempted sexual assault and, in particular, being victims when they are incapacitated by alcohol.

46.     These mandates made it more difficult for male students to defend themselves from allegations of sexual misconduct by lowering the burden of proof against those accused, and denying the accused's right to cross exam the alleged victim or witnesses.

47.     On April 29, 2014, the Department issued guidance to universities that receive federal assistance. (the "2014 Guidance"). As with the 2011 Letter, the 2014 Guidance expressed a strong bias in favor of protecting the rights of the complainant, regardless of an accused's rights to due process. To that end, it provides: "Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protection by Title IX to the complainant."

48.     The 2014 Guidance informed universities that they did not have to allow the accused to cross-examine the complainant or witnesses; in fact, the complainant did not even have to attend a disciplinary hearing. A school's decision to provide an accused more due process rights would be treated by the Department as evidence of a "hostile environment."

49.     On May 1, 2014, the Department identified IU as one of several higher education institutions under investigation for possible Title IX violations over its handling of sexual violence and harassment complaints.   https://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-ix-sexual-violence-investigations

51.     Between June 2015-September 2016, IU was the subject of four separate investigations based on complaints filed by female students that their sexual assault complaints had been mishandled.

52.     On September 22, 2017, the Department withdrew the 2011 Letter. In doing so, the Department acknowledged that, as a result of the 2011 Letter, "many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process,

16

are overwhelmingly stacked against the accused, and are in no way required by Title IX or regulation.'"

53.     On November 16, 2018, three days after the Panel's decision in this case, the Department formally proposed new regulations designed to create a more just process for campus tribunals to adjudicate sexual misconduct allegations.  The new regulations will permit the accused to have a lawyer present in the disciplinary hearing who can cross-examine witnesses, including the complainant.

54.     As of the date of Plaintiff's suspension, IU had not yet amended the due process provisions of its Sexual Misconduct Policy that were adopted in the wake of the 2011 Letter and 2014 Guidance and which the Department has since recognized to have "led to the deprivation of rights for many students."

55.     In late Fall 2017, after revelations of widespread sexual abuse of women by high-profile male figures, including Hollywood producer Harvey Weinstein and a parade of others, a national backlash, eventually known as the "#MeToo movement," erupted against organizations for failing to aggressively punish males accused of sexual assault.

56.     In the wake of the #MeToo movement, educational institutions such as IU have been under intense scrutiny and pressure to aggressively pursue claims of sexual assault by female students.  This societal pressure has resulted in overly zealous prosecutions of male students accused of sexually assaulting female students, and a willingness to rush to judgments against such male students without a careful consideration of the evidence.

### COUNT I
### VIOLATION OF TITLE IX
### (Against Indiana University)

57.     Plaintiff realleges paragraphs 1-56 as if fully set forth herein.

58.     Title IX prohibits universities that receive federal financial assistance from discriminating against students on the basis of sex, and provides a private right of action for students to seek redress for violations of the Act. 20 U.S.C. §1681(a).

59.     IU receives federal financial assistance and is subject to Title IX.

60.     In the past several years, IU has been under increasing pressure to aggressively pursue claims of sexual assault by female students against male students.  IU succumbed to these pressures and violated Title IX by suspending Plaintiff based on an erroneous, arbitrary, and capricious decision with a discriminatory intent to favor the female student, Defendant Giallonardo, over the male student, Plaintiff.

61.     This bias is illustrated by the following:

   a.     On information and belief, in the year preceding Plaintiff's suspension (July 1, 2017-December 10, 2018), more than 50% of male students accused of sexual assault at IU were ordered to attend a hearing after being investigated, while not a single one of the accused female students proceeded to a hearing after investigation. *Doe v. Indiana Univ.*, 2019 WL 341760 (S.D. Ind. 2019);

   b.     This gender bias is present not only when male students are the accused, but also when female students are the alleged victims. For example, only 12% of IU's male students who had been investigated for alleged sexual assault against female students were exonerated,[1] while 100% of students accused of sexually assaulting male students were exonerated. *Id.*;

---

[1] This includes complaints made by females against males, as well as males against males.  There were no recorded instances of female-on-female assaults.

c.    IU unilaterally blamed Plaintiff for non-consensual sex and considered only Defendant Giallonardo's capacity to consent, without any consideration of whether *he* was too "incapacitated" as a result of his undisputed intoxicated state to consent to the same sex act.

62.    As a direct and proximate result of IU's violation of his Title IX rights, Plaintiff was erroneously found to have violated IU's Sexual Misconduct Policy, suspended from IU, and suffered extreme emotional distress.

**COUNT II**
**42 U.S.C. §1983**
**VIOLATION OF DUE PROCESS UNDER**
**THE FIFTH AND FOURTEENTH AMENDMENTS**
**(Against Indiana University)**

63.    Plaintiff realleges paragraphs 1-62 as if fully set forth herein.

64.    The Fifth and Fourteenth Amendments to the United States Constitution prohibit the deprivation of an individual's "liberty or property without due process of law."

65.    Courts have repeatedly and recently recognized that "[s]uspension [from a university] 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn [a student's] reputation and integrity, thus implicating a protected liberty interest.'" *Doe v. Cummins*, 662 Fed.Appx. 437, 445 (6th Cir. 2016).  *See also Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Miami University*, 882 F.3d 579 (6th Cir. 2018); *Doe v. University of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017); *Norris v. University of Colorado, Boulder,* 2019 WL 764568 (D. Colo. 2019); *Doe v University of Mississippi*, 2019 WL 238098 (S.D. Miss. 2019); *Doe v Pennsylvania State University*, 336 F.Supp.3d 441 (M.D. Pa. 2018).

66.    As a student of a public state university that receives federal funding, Plaintiff was entitled to the due process protections of the Fifth and Fourteenth Amendments. 42 U.S.C. § 1983.

67.     IU violated Plaintiff's due process protections by:

    a.     denying him any meaningful opportunity to cross-examine his accuser, both by its refusal to allow him or his representative to cross-examine Defendant Giallonardo and by the Panel's refusal to ask her the questions submitted by him;

    b.     failing to apply the required "preponderance of the evidence standard (more likely than not)";

    c.     reaching an arbitrary, capricious and clearly erroneous decision that was not supported by the record evidence, as described above in paragraph 41.

68.      As a direct and proximate result of the deprivation of his Fifth and Fourteenth Amendment rights to due process, Plaintiff was erroneously found to have violated IU's Sexual Misconduct Policy, suspended from IU, and suffered extreme emotional distress.

**COUNT III**
**BREACH OF CONTRACT**
**(Against Indiana University)**

69.     Plaintiff realleges paragraphs 1-68 as if fully set forth herein.

70.     When IU enrolled Plaintiff in the university and Plaintiff paid his tuition and accepted his enrollment, IU and Plaintiff entered into a valid and binding contract.

71.     The terms of the contract between IU and Plaintiff are reflected in IU's Code of Student Rights, Responsibilities, and Conduct ("Code of Student Rights"); its Non-Discrimination/Equal Opportunity/Affirmative Action Policy (Non-Discrimination Policy"); and its Sexual Misconduct Policy, as well as other catalogs and bulletins issued by IU.

72.     The Code of Student Rights and the Non-Discrimination Policy explicitly protect students from discrimination on the basis of sex.  Those policies state:

a.  "Students have the right to study, work, and interact in an environment that is free from discrimination in violation of law or university policy by any member of the university community;"

b.  "As required by Title IX of the Education Amendments of 1972, Indiana University does not discriminate on the basis of sex in its educational programs and activities."

73.     The Sexual Misconduct Policy provides additional protections for students, both in its definition of a policy violation and the procedural safeguards required to be provided for students accused of a violation.  The following definitions apply:

a.  "Sexual Assault" is defined as "Non-consensual Sexual Penetration" or other "Non-consensual Sexual Contact;"

b.  "Consent" is defined as "an agreement expressed through affirmative, voluntary words or actions, and mutually understandable to all parties involved, to engage in a specific sexual act at a specific time;"

c.  "Consent cannot be given by someone who is incapacitated," which is defined as the inability to "understand the facts, nature, extent, or implications of the situation due to drugs, alcohol, a mental disability, being asleep or unconscious, or based on their age (pursuant to Indiana law);"

d.  Cases involving a claim of "incapacitation" require sufficient proof that "the individual initiating sexual activity *knew or should have known* of the other person's incapacitation."

74.     In determining whether a violation has occurred, the Sexual Misconduct Policy allows that "prior sexual history between the parties . . . may be relevant to the issue of consent."

75.     A student accused of sexual misconduct is guaranteed the following rights:

    a.     "a fair and impartial investigation and resolution for complaints;"

    b.     "the use of the preponderance of the evidence standard (more likely than not) in determining responsibility;" and

    c.     "corrective action [where appropriate], . . . [that] will depend on the circumstances of the particular case."

76.     Additionally, the duty of good faith and fair dealing implied in every Indiana contract prohibits IU from acting in an arbitrary or capricious manner in disciplining Plaintiff and requires that disciplinary hearings be conducted with basic fairness.

77.     Plaintiff fulfilled his contractual obligations to IU by paying his tuition and abiding by the policies set forth in the IU Code of Student Rights.

78.     IU breached its contractual obligations to Plaintiff by subjecting him to a disciplinary process that violated the express terms of the foregoing policies, including by:

    a.     failing to provide Plaintiff with "a fair and impartial investigation and resolution for" the complaint against him;

    b.     failing to apply the required "preponderance of the evidence standard (more likely than not)";

    c.     failing to properly apply the definitions of "consent" and "incapacitation;"

    d.     failing to consider whether Plaintiff was "incapacitated" due to his level of intoxication and therefore, able to consent to the sexual encounter or to recognize if Defendant Giallanardo was incapacitated;

     e.     failing to consider the "prior sexual history between the parties," especially in light of its relevance to Plaintiff's familiarity with Defendant Giallonardo's behavior during drunken sex;

     f.     imposing a draconian sanction against Plaintiff that completely ignores "the circumstances of the particular case."

79.    As a direct and proximate result of IU's breach of contract, Plaintiff was erroneously found to have violated IU's Sexual Misconduct Policy, suspended from IU, and suffered extreme emotional distress.

**COUNT IV**
**PROMISSORY ESTOPPEL**
**(Against Indiana University)**

80.    Plaintiff realleges paragraphs 1-79 and as if fully set forth herein.

81.    Plaintiff brings this claim in the alternative to Count III in the event the Court determines that a contract was not made between Plaintiff and IU.

82.    IU made an unambiguous promise to Plaintiff that, in the event of a sexual misconduct complaint against him, it would provide him with "a fair and impartial investigation and resolution" process, apply a "preponderance of the evidence standard," and only impose discipline if appropriate under "the circumstances of the particular case."  IU also made an unambiguous promise not to discriminate against Plaintiff on the basis of his sex.

83.    Plaintiff relied on IU's unambiguous promises by participating in IU's disciplinary proceedings in accordance with the Sexual Misconduct Policy.

84.    Plaintiff's reliance was expected and foreseeable by IU.

85.    Plaintiff relied upon IU's promise to his detriment in that the disciplinary process that he participated in turned out to be neither fair nor impartial, failed to apply the required

"preponderance of the evidence standard," and imposed a disciplinary sanction that was completely unwarranted by the evidence.

86.     As a direct and proximate result of Plaintiff's foreseeable reliance on IU's promises, Plaintiff was erroneously found to have violated IU's Sexual Misconduct Policy, suspended from IU, and suffered extreme emotional distress.

### COUNT V
### DEFAMATION
### (Against Defendant Giallonardo)

87.     Plaintiff realleges paragraphs 1-86 as if fully set forth herein.

88.     Defendant Giallonardo made numerous false statements about Plaintiff, including the following:

> a.     that Plaintiff sexual assaulted her after the October 28, 2017 Halloween party while she was unconscious;
>
> b.     that Plaintiff gave her a "roofie" (a date rape drug) on the night of the incident;
>
> c.      that Plaintiff inflicted "bruises" to her body during this sexual encounter.

89.      Plaintiff made unprivileged publications of these statements by telling her friends, her boyfriend, IU's investigator, the Panel, and others present during the hearing.

90.     These false statements are defamatory *per se* because they impute that Plaintiff has committed crimes.

91.      These false and defamatory statements were made with actual malice, knowledge of or reckless disregard for the falsity of her statements, and with the intent to injure Plaintiff and constitute willful and wanton conduct.

92.     As a direct and proximate result of Defendant Giallonardo's defamatory statements, Plaintiff was erroneously found to have violated IU's Sexual Misconduct Policy, suspended from IU, and suffered extreme emotional distress.

## COUNT VI
## FALSE LIGHT
### (Against Defendant Giallonardo)

93.     Plaintiff realleges paragraphs 1-92 as if fully set forth herein.

94.     As set forth in paragraphs 88-89, Defendant Giallonardo made numerous false statements about Plaintiff to her friends, her boyfriend, IU's investigator, the Panel, and others present during the hearing.

95.     As a result of Defendant Giallonardo's false statements, Plaintiff was placed in a false light as a sexual predator and physical abuser.

96.     The false light in which Defendant Giallonardo placed Plaintiff would be highly offensive to a reasonable person.

97.     These false and defamatory statements were made with actual malice, knowledge of or reckless disregard for the falsity of the statements, and with the intent to injure Plaintiff and constitute willful and wanton conduct.

98.     As a direct and proximate result of Defendant Giallonardo's false statements, Plaintiff was erroneously found to have violated IU's Sexual Misconduct Policy, suspended from IU, and suffered extreme emotional distress.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendants Indiana University and Giallonardo)

99.     Plaintiff realleges paragraphs 1-98 as if fully set forth herein.

100.     IU's conduct in wrongfully determining that Plaintiff committed sexual assault and suspending him from IU was extreme and outrageous.

25

101.     Plaintiff described at the hearing how difficult it had been for him, as an introverted transfer student, to fit in at a big university like IU.  He also testified that he has suffered from clinical depression for many years and that Defendant Giallonardo's complaint had taken him "to new lows."

102.     Accordingly, IU intended to inflict severe emotional distress on Plaintiff or, at the very least, knew there was a high probability that its conduct would inflict such severe emotional distress.

103.     IU's actions have, in fact, caused Plaintiff to suffer severe emotional distress in the form of extreme anxiety, depression, and suicidal ideation.

104.     Defendant Giallonardo's conduct in falsely claiming that Plaintiff gave her a date rape drug, sexually assaulted her, and inflicted "bruises" on her arms and legs during sex, was extreme and outrageous.

105.     Defendant Giallonardo was aware prior to making her sexual assault complaint that Plaintiff was a transfer student who was struggling to fit in at IU and that he suffered from depression.

106.     Defendant Giallonardo intended to inflict severe emotional distress on Plaintiff or, at the very least, knew there was a high probability that her conduct would inflict such severe emotional distress.

107.     Defendant Giallonardo's actions have, in fact, caused Plaintiff to suffer severe emotional distress in the form of extreme anxiety, depression, and suicidal ideation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court grant the following relief:

A.      Enter a judgment that the conduct of the Defendants alleged herein violates the laws of the United States and the State of Indiana;

B.      Award Plaintiff all damages to which he is entitled as a result of Defendants' unlawful conduct;

C.      Award Plaintiff the costs of this action, including reasonable attorneys' fees, and any other costs reasonably incurred in the litigation of this matter;

D.      Award Plaintiff such other and further equitable, injunctive and legal relief as this Court finds necessary and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

TIMOTHY SCHERMAN

By      s/Brenda H. Feis
         One of His Attorneys

Brenda H. Feis
Elisabeth G. Mustoe
FEIS GOLDY LLC
161 N. Clark Street
Suite 1600
Chicago, IL  60601
(312) 523-2200
bfeis@feisgoldy.com
emustoe@feisgoldy.com

May 8, 2019